**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ASHINC CORPORATION, *et al.* | Chapter 11 |
| Debtors. | Bk. No. 12-11564 (CSS)<br>Adv. No. 13-50530 (CSS) |
| MARK GENDREGSKE, *et al.*<br><br>Appellants,<br><br>v.<br><br>BLACK DIAMOND COMMERCIAL<br>FINANCE LLC, *et al.*,<br><br>Appellees, | Civ. No. 14-1415-SLR |

**BRIEF OF APPELLANTS MARK J. GENDREGSKE AND BRIAN CULLEN
IN SUPPORT OF APPEAL**

Derek C. Abbott (No. 3376)
Erin R. Fay (No. 5268)
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street
Wilmington, Delaware 19801
T:  (302) 658-9200
F: (302) 658-3989
dabbott@mnat.com
efay@mnat.com

John C. Massaro
Ian S. Hoffman
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, D.C.  20004-1206
T: 202-942-5000
F: 202-942-5999
john.massaro@aporter.com
ian.hoffman@aporter.com

*Counsel for Mark Gendregske and Brian Cullen*

Dated: July 9, 2015

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ...................................... 1

SUMMARY OF ARGUMENT ............................................................................... 2

STATEMENT OF FACTS .................................................................................... 2

    I.      Adversary Proceeding Against Mr. Gendregske and Others ................................. 4

    II.    Process That Led to the Settlement Agreement .................................................... 4

    III.   Settlement Agreement and Settlement Motion ...................................................... 5

    IV.   Appellants' Request for Hearing on the Settlement Motion ................................. 7

    V.    Bankruptcy Court Denial of Hearing Request and Settlement Motion ................. 8

ARGUMENT ................................................................................................... 10

    I.      Standard of Review ............................................................................................ 10

    II.    The Bankruptcy Court Erred by Denying the Settlement Motion Based on the
         Erroneous Conclusion that Yucaipa Could "Opt Out" of the Settlement
         Agreement ........................................................................................................ 11

    III.   The Bankruptcy Court Erred by Concluding that the Settlement Agreement
         Was Required to Fix the Amount of Yucaipa's Allowed Claim for All Parties ... 15

    IV.   The Bankruptcy Court Erred by Refusing to Conduct an Evidentiary Hearing
         on Whether the Settlement Agreement Is in the Best Interests of Debtors'
         Estates .............................................................................................................. 18

CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Carney v. Carozza*,
    792 N.Y.S.2d 642 (N.Y. App. Div. 2005) ........................................................................19

*Forbo-Giubiasco S.A. v. Congoleum Corp.*,
    482 F. Supp. 716 (S.D.N.Y. 1980) ..................................................................................20

*In re Frye*,
    216 B.R. 166 (Bankr. E.D. Va. 1997) .............................................................................13

*Long v. Fitzgerald*,
    659 N.Y.S.2d 544 (N.Y. App. Div. 1997) .......................................................................20

*In re Lyons Transp. Lines, Inc.*,
    163 B.R. 474 (Bankr. W.D. Pa. 1994) .............................................................................13

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ........................................................................ 10, 11, 18, 20

*In re Nutraquest, Inc.*,
    434 F.3d 639 (3d Cir. 2006) ...........................................................................................10

*In re RFE Indus., Inc.*,
    283 F.3d 159 (3d Cir. 2002) .................................................................................... 10, 18

*In re Seminole Walls & Ceilings Corp.*,
    388 B.R. 386 (M.D. Fl. 2008) ................................................................................. 12, 13

*In re Tidewater Group, Inc.*,
    8 B.R. 930 (Bankr. N.D. Ga. 1981) ................................................................................13

*In re Turner*,
    274 B.R. 675 (Bankr. W.D. Pa. 2002) ............................................................................13

*In re United Shipping Co.*,
    No. 4-88-533, 1989 WL 12723 (Bankr. D. Minn. Feb. 17, 1989) ..................................13

## Other Authorities

10 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 9019.02A (16th
    ed.) ...................................................................................................................................13

Fed. R. Bankr. P. 9019 ........................................................................................... 10, 12, 15

Restatement (Second) of Contracts § 153 (1981) .......................................................................20

## **STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

This appeal arises out of the Bankruptcy Court's erroneous disapproval of a settlement agreement, and erroneous refusal even to hold a hearing to consider whether to approve that settlement agreement.  The settlement agreement at issue resolved all claims on behalf of Allied (the entity in bankruptcy) against all of Allied's individual directors, including Appellants Mark Gendregske and Brian Cullen.  The settlement not only would result in a substantial infusion of money into the bankruptcy estates and lift the cloud of litigation that has been hanging over Appellants for years, but it also would have preserved the ongoing—and far more substantial— war being waged between Allied's majority equity owner, Yucaipa, and two of Allied's lenders, Black Diamond and Spectrum.  Indeed, this action is only one of multiple pending lawsuits and appeals involving Yucaipa and Black Diamond / Spectrum, and neither Mr. Gendregske nor Mr. Cullen are named as defendants in any of those other cases.

However, between the time the settlement agreement was signed and the time it was presented to the Bankruptcy Court, the other settling parties had a change of heart and decided to abandon the agreement.  Instead of asking the Bankruptcy Court to approve the agreement, the other settling parties outright *opposed* having a hearing to approve the settlement agreement and *opposed* the Bankruptcy Court's approval of the settlement agreement—in breach of their express obligation to support approval of the agreement—arguing *inter alia* that the fight between the larger warring factions must continue.  In response, the Bankruptcy Court refused to hold a hearing on the settlement motion and denied the motion to approve the settlement and, in so doing, committed reversible error.

In light of the Bankruptcy Court's ruling, the plaintiff in this proceeding—the Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. (the "Committee"),

continues to assert claims against Mr. Gendregske and hold out the possibility of asserting claims against Mr. Cullen. Most recently, this Court withdrew the Bankruptcy Court reference for the claims asserted against Mr. Gendregske, confirming those claims will be tried before a jury in this Court. D.I. 17 (Civ. No. 13-1010). The case remains in fact discovery, pursuant to the scheduling order dated May 15, 2015. D.I. 27 (Civ. No. 13-1010).

## SUMMARY OF ARGUMENT

1.      The Bankruptcy Court erred by interpreting the settlement agreement to provide Yucaipa a free "out" of its obligations under the agreement and rejecting the agreement on this basis.

2.      The Bankruptcy Court erred by interpreting the settlement agreement to fix the amount of certain claims against the bankruptcy estates and rejecting the agreement on this basis, when the agreement actually preserves the ability of other parties to object to those claims.

3.      The Bankruptcy Court erred by rejecting the settlement agreement without conducting a hearing and thus failing to consider any evidence concerning whether the settlement is in the best interests of Debtors' estates, as is required under well-established Third Circuit law.

4.      Accordingly, the Bankruptcy Court's order should be reversed, and the motion seeking approval of the settlement agreement should be granted. Alternatively, the Bankruptcy Court's order should be vacated and this matter remanded for an evidentiary hearing as required by law.

## STATEMENT OF FACTS

From 2007 through the end of 2013, Mr. Gendregske served as the CEO and a director of Allied, the primary Debtor in the underlying bankruptcy proceedings. Allied was an industry

2

leader in providing distribution and transportation services to automobile manufacturers in North America, focusing on transporting new vehicles from manufacturing plants to dealers. Allied emerged from a prior bankruptcy in May 2007 with equity financing provided by Yucaipa, who was—and remains—the majority equity owner of Allied. Allied also obtained debt financing through various lending arrangements, including a first and second lien credit facility. Black Diamond and Spectrum are among the first lien lenders.

Allied had a five-member board of directors. Mr. Gendregske was one of two independent directors unaffiliated with Yucaipa. He was selected as CEO and director by Yucaipa with the approval of the labor union and the Creditors' Committee in the prior bankruptcy case. Mr. Cullen was the second independent, non-Yucaipa affiliated director. Mr. Cullen is a Managing Director at Duff & Phelps, a leading global financial advisory and investment banking firm, where he is the head of the Domestic Restructuring Advisory practice. Mr. Cullen is not named as a defendant in any litigation. However, he executed a standstill agreement with the Committee near the outset of this proceeding that contemplated potential claims being asserted against him.

Soon after emerging from its first bankruptcy in 2007, Allied—like most every company whose operations touched the automobile industry—saw its performance suffer significantly, as a result of, among other things, the "Great Recession." In 2008 and 2009, faced with these dire economic circumstances, Allied's board and special committee, on which Mr. Gendregske and Mr. Cullen served, considered and approved two amendments to the first lien credit agreement— referred to as the Third and Fourth Amendments—which gave Yucaipa an ability to acquire first lien debt. These amendments are the focus of the allegations in the litigation involving Mr.

3

Gendregske, and are the source of many of the disputes between Yucaipa and Black Diamond / Spectrum.

On May 18, 2012, Black Diamond and Spectrum filed an involuntary bankruptcy petition in the Bankruptcy Court. *See* D.I. 1 (Bankr. No. 12-11564). The next month, Allied consented to the bankruptcy and filed a voluntary chapter 11 petition with the Bankruptcy Court. D.I. 88 (Bankr. No. 12-11564).

## I.    Adversary Proceeding Against Mr. Gendregske and Others

In February 2013, the Committee initiated an adversary proceeding in the Bankruptcy Court on behalf of Debtors' estates (the "Committee Adversary Proceeding") by filing a complaint asserting claims against Yucaipa, the Yucaipa-affiliated directors who sat on Allied's board, and Appellant Mark Gendregske. *See* D.I. 76 (Adv. Proc. No. 13-50530) (the "Amended Complaint") (attached as **Exhibit A**).[1] The Committee asserts claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty against Mr. Gendregske and the other individual directors (except for Mr. Cullen). *Id.* ¶¶ 179-93. Between February and July 2013, the parties to the Committee Adversary Proceeding—including Mr. Gendregske—engaged in substantial litigation on an expedited schedule, exchanging millions of pages of documents and scores of written discovery requests and responses, and briefing and arguing various motions.

## II.    Process That Led to the Settlement Agreement

On March 27, 2013, near the outset of discovery in the Committee Adversary Proceeding, the Bankruptcy Court referred the parties to mediation before the Honorable Robert D. Drain, U.S. Bankruptcy Judge for the Southern District of New York. In the months following, all parties—including Appellants, Yucaipa, the Committee, Black Diamond, Spectrum, the Debtors,

---

[1]    All exhibits cited herein are attached to the appendix being submitted with this brief.

and various insurers for the parties—participated in extensive settlement negotiations before

Judge Drain.  When Yucaipa and Black Diamond / Spectrum were unable to settle the disputes

between them, Judge Drain proceeded to negotiate a settlement to resolve at least the estate

claims held by the Debtors' estates and being litigated in the Committee Adversary Proceeding.

Following those mediation sessions, the parties to the settlement agreement engaged in

additional weeks of intense, good-faith negotiations.

On July 26, 2013, as a result of this robust process—and on the verge of taking 50

depositions in the Committee Adversary Proceeding—the parties executed the settlement

agreement and submitted it for approval in the Bankruptcy Court.  D.I. 1489 (Bankr. No. 12-

11564) (the "Settlement Motion") (attached as **Exhibit B**).

## III.    Settlement Agreement and Settlement Motion

The settlement agreement provides for, *inter alia*, a cash payment of $17 million to the

Debtors' estates—consisting of $6 million paid by the directors' insurance carriers, $6 million

paid by Yucaipa, and $5 million paid by Yucaipa's insurance carrier—as well as a non-cash

contribution from Yucaipa in the form of a waiver of $41 million worth of Yucaipa's claims

against the Debtors' estates.  *See* D.I. 1489-2 §§ I, II, III (Bankr. No. 12-11654) (the "Settlement

Agreement") (attached as **Exhibit C**).  The agreement provided that, in exchange for these

contributions, the Debtors would release all estate claims against all of Allied's directors,

including Appellants.  *Id.* § VII.

The settlement agreement also required all parties—including Yucaipa and the

Committee—to support and implement the agreement.  Section IX.B provides as follows:

> <u>Implementation of the Settlement</u>.  The Parties (i) acknowledge
> that it is their intent to consummate this Agreement; and (ii) agree
> to cooperate to the extent reasonably necessary to effectuate and
> implement all terms and conditions of this Agreement and to

5

> exercise their best efforts to accomplish the foregoing terms and conditions of this Agreement.

*Id.* § IX(B).  Section VIII(A) and (B) of the settlement agreement provide as follows:

> A.    The Parties shall file a joint motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Joint Settlement Motion") with the Bankruptcy Court jointly by the Committee and the Defendants along with an "Approval Order" for the Bankruptcy Court's signature which Approval Order shall be identical to the form of Exhibit A.
>
> B.    The Committee and the Defendants shall promptly file the Joint Settlement Motion and Approval Order with the Bankruptcy Court along with a motion to shorten time to hear the Joint Settlement Motion, and seek to schedule a hearing on the Joint Settlement Motion no later than August 2, 2013, or as soon as reasonably practicable thereafter consistent with the Bankruptcy Court's calendar.  The Parties shall take all such further action as may be reasonably necessary to seek prompt early entry of the Approval order by the Bankruptcy Court.

*Id.* § VIII(A)-(B).

In the Settlement Motion, the parties represented that the settlement agreement is "fair and reasonable and all of the Settlement Parties respectfully submit that the compromise embodied in the Settlement Agreement is in the best interests of the Debtors' creditors." Ex. B ¶ 54.  The parties accurately described the agreement as "a highly negotiated and arms-length compromise" that will "immediately provide valuable consideration to the Debtors' estates" and will "eliminate many of the substantial costs, delay and uncertainty associated with litigating the issues being resolved by the Settlement."  *Id.* ¶¶ 2-3.  Indeed, each of the parties to the agreement—including the Committee, Yucaipa, the Yucaipa-affiliated directors and Appellants—specifically represented to the Bankruptcy Court that the agreement:

- [I] "Represents a reasonable balance between the risks of litigating the underlying disputes and the concrete benefits of settlement," (*id.* ¶ 4)

- [II] "Avoids complex and costly litigation and provides definite, certain and immediate recoveries to the Debtors' estates," (*id.*)

- [III] "Benefits the Debtors' creditor constituencies as well as the Debtors' estates as a whole by advancing the overall process towards resolution of these bankruptcy cases;" (*id.*)

- [IV] "Is the product of good faith, arm's length negotiations by and among sophisticated parties, including pursuant to the Court-ordered mediation presided over by Judge Drain." (*id.*)

## IV.    Appellants' Request for Hearing on the Settlement Motion

On October 24, 2013, before conducting a hearing on the Settlement Motion, the Bankruptcy Court ordered all of the parties to return to mediation with the goal of reaching a "global deal" that would include not only a settlement between the parties to the settlement agreement, but also a settlement between all parties involved in all related disputes and litigation—in particular, a resolution of the individual (non-estate) claims asserted and/or threatened between Yucaipa and Black Diamond / Spectrum.  *See* D.I. 308 (Adv. Proc. No. 13-50530); Transcript of Proceedings at 25 (Oct. 24, 2013) (Adv. Proc. No. 13-50530) (attached as **Exhibit D**).    To that end, the other parties—principally Yucaipa and Black Diamond / Spectrum—engaged in several mediation sessions in early 2014 overseen by Judge Drain.  Those mediation sessions were not successful.

On August 25, 2014, Appellants filed a request for hearing on the Settlement Motion. D.I. 2554 (Bankr. No. 12-11564) (the "Request for Hearing") (attached as **Exhibit E**).  That request specifically asked the Bankruptcy Court to schedule a hearing on the Settlement Motion, at which time the Court could hear evidence and determine as a factual matter whether the settlement agreement was in the best interests of the Debtors' estates.  *Id.* at 4-5.

Despite their express obligation in the settlement agreement to seek prompt approval of and to support the settlement, and contrary to the numerous representations in the Settlement

Motion regarding the benefits the settlement provided to the Debtors' estates, Yucaipa, the Committee, and Black Diamond / Spectrum opposed the Request for Hearing.  *See* D.I. 2576, 2584, 2585 (Bankr. No. 12-11564) (attached as **Exhibits F, G,** and **H**).  No discovery was taken with respect to the Settlement Motion or the fundamental issue of whether the settlement agreement was in the best interests of the Debtors' estates.

**V.    Bankruptcy Court Denial of Hearing Request and Settlement Motion**

On October 6, 2014, the Bankruptcy Court held a hearing (purely oral argument) on the Request for Hearing.  At the end of that hearing, the Bankruptcy Court concluded:  "I consider this agreement to be, to use the vernacular, DOA."  Transcript of Proceedings at 37 (Oct. 6, 2014) (Sontchi, J.) (Bankr. No. 12-11564) (attached as **Exhibit K**).  According to Judge Sontchi, conducting an evidentiary hearing on the Settlement Motion to determine whether the settlement agreement is in the best interests of Debtors' estates "would be a colossal waste of everybody's time" because "as drafted I don't see any way that the Court would approve the agreement."  *Id.* The original Settlement Motion itself and the settlement agreement each contained statements from the parties supporting the reasonableness of the settlement agreement; by contrast, no evidence of any kind was presented at the hearing by the parties opposing the settlement.

In particular, the Bankruptcy Court held the settlement agreement gives Yucaipa an "out" that would "remove Yucaipa from the settlement agreement and remove any releases or fixing of claim amount that would apply to Yucaipa."  *Id.* at 37-38.  This conclusion stemmed from an argument—asserted for the first time at the hearing by one of the counsel to Yucaipa—that the settlement agreement gave Yucaipa the unilateral option to terminate and void only Yucaipa's portion of the settlement agreement, and that Yucaipa could exercise this option merely by electing not to honor its payment obligations under the settlement agreement.  *See id.* at 25-27.

8

Yucaipa's counsel stated at the hearing that it was exercising this option and the Bankruptcy Court accepted it, concluding that this "out" was a "problem" because Yucaipa is "a key party to whatever settlement could be achieved, and they provide by far the bulk of the consideration that was included in the settlement." *Id*. at 37-38.  If Yucaipa exercised its "out," the Bankruptcy Court concluded, all that would remain is "a very narrow settlement over a small amount of money that is insufficient to satisfy the legal standards." *Id*. at 37.  As described below, the settlement agreement does not permit this; rather, the agreement expressly required the parties to support the settlement.

In issuing its ruling, the Bankruptcy Court also stated:  "I in no way am being dismissive of the amount of time and effort that Judge Drain put in, as well as all the parties in trying to reach a resolution, and it may be that 13 months ago I would have approved the agreement." *Id*. at 39.  Indeed, between the time the settlement agreement was executed and the time of the court's ruling, Yucaipa and Black Diamond / Spectrum had engaged in further mediation efforts with Judge Drain concerning the claims between them, which efforts were unsuccessful.

After denying the Request for Hearing, the Bankruptcy Court ruled that it would also deny the Settlement Motion itself, without conducting a hearing or considering any evidence. *Id*. at 40.  The Court memorialized its ruling by issuing an order on October 6, 2014, which denies the Request for Hearing and the Settlement Motion "for the reasons set forth on the record at the Hearing." D.I. 2621 (Bankr. No. 12-11564) (attached as **Exhibit J**).

On October 20, 2014, the Appellants filed a notice of appeal.  D.I. 2651 (Bankr. No. 12-11564).

9

# ARGUMENT

## I.   Standard of Review

Federal Rule of Bankruptcy Procedure 9019 governs settlements in bankruptcy proceedings.  In ruling on a motion for approval of a settlement under Rule 9019, a bankruptcy court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  To conduct this assessment, the Court must consider each of the following factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Id.*  Most significantly, the Court must consider and make specific factual findings with respect to each factor.  *In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (reversing denial of settlement motion where court "did not make any findings of fact on these four [*Martin*] issues").  Accordingly, after the submission of a motion under Rule 9019, parties may take some discovery and present a factual case to the Court—at which time any objectors may cross examine the proponents' evidence, and the proponents can rebut any such objections—to provide the Court with the record upon which it can make findings with respect to each of the *Martin* factors.

While district courts generally review a bankruptcy court's approval or disapproval of a settlement agreement under Rule 9019 for abuse of discretion, legal questions—including "whether it applied the proper test in approving the settlement"—are reviewed *de novo*.  *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006); *see also RFE Indus.*, 283 F.3d at 165 ("We review *de novo* whether the bankruptcy court should have analyzed the Settlement under the *Martin* analysis.").  Here, the Bankruptcy Court's decision must be reviewed *de novo* because

the Bankruptcy Court conducted no hearing, considered no evidence, made no factual findings, and considered only the legal arguments of the parties, including arguments concerning the interpretation of the settlement agreement.

## II.   The Bankruptcy Court Erred by Denying the Settlement Motion Based on the Erroneous Conclusion that Yucaipa Could "Opt Out" of the Settlement Agreement

As a party to the settlement agreement, Yucaipa is bound to comply with that Agreement. The Bankruptcy Court erred by denying the Settlement Motion—without conducting a hearing or making any factual findings on the *Martin* factors—based on Yucaipa's attempt to "opt out" of the agreement.

The agreement specifically and expressly requires all parties, including Yucaipa, to support the agreement and seek court approval of the agreement. *See* Ex. C §§ VIII(A)-(B), IX(B).   Specifically, the agreement requires the parties, including Yucaipa, to "seek to schedule a hearing on the Joint Settlement Motion . . . as soon as reasonably practicable" and to "*take all such further action as may be reasonably necessary to seek prompt entry of the Approval Order by the Bankruptcy Court.*" *Id.* § VIII(B) (emphasis added).   The agreement also requires the parties to "cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement and to *exercise their best efforts to accomplish the foregoing terms and conditions of this Agreement.*" *Id.* § IX(B) (emphasis added).   Additionally, the agreement provided each party with the "right to enforce by proceedings at law or in equity all of the terms and provisions of this Agreement." *Id.* § IX(L).

Yucaipa's conduct before the Bankruptcy Court—namely, abandoning all support of the agreement and objecting even to conducting a hearing on the Settlement Motion—was directly contrary to these clear contractual obligations to "seek prompt entry" of an order approving the settlement agreement and to exercise "best efforts" to accomplish the terms of the settlement

11

agreement.  By refusing to support the agreement and actively opposing its approval, Yucaipa

breached these provisions of the settlement agreement.

The settlement agreement was valid and binding notwithstanding the fact that it was

subject to Court approval.  Bankruptcy courts consistently recognize that settlement agreements

submitted for court approval under Rule 9019 become a valid contract the moment they are

executed and remain binding unless and until the Court does *not* approve the agreement.  For

example, in *In re Seminole Walls & Ceilings Corp.*, 388 B.R. 386, 389-90 (M.D. Fl. 2008), a

party to an adversary proceeding entered into a settlement agreement with the trustee, filed a

Rule 9019 motion seeking court approval of that agreement, then sought to rescind that

agreement on various grounds, including mutual mistake, before the court had an opportunity to

approve the motion.  The bankruptcy court granted rescission, but the district court reversed,

holding that "parties to a settlement agreement may not unilaterally repudiate it after approval of

it has been sought pursuant to Rule 9019."  *Id*. at 392.  The court explained:

> [A] party to a valid settlement agreement is bound to the contract
> unless and until the bankruptcy court rejects the settlement, the
> happening of which voids the agreement.  Permitting either party
> to withdraw seriously disadvantages those who—though they have
> no obligation to act under the terms of the contract—undoubtedly
> will change their course of action in reliance on the existence of a
> valid and binding agreement, performance under which will occur
> upon approval. . . . Condoning such strategy [of withdrawal from
> agreements] . . . wastes the time of the parties who may have spent
> hours and substantial sums of money in negotiations, contract
> drafting, and contract execution.  It further places the estate in a
> precarious position when negotiating settlements.   Parties to
> settlement agreements are entitled to some certainty that the
> agreement they enter into is valid and will be effective and
> enforceable if the bankruptcy court approves it.  To hold otherwise
> would be contrary to the principles of contract formation and
> contrary to the strong public policy favoring the settlement of
> disputes.

*Id.* at 395; *see also* 10 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 9019.02A (16th ed.) ("In addition, a debtor can be compelled to file a motion to approve a settlement even if the debtor has changed its mind.  Settlement agreements frequently provide that they are binding upon the parties when executed subject to the condition subsequent of the court's approval.").  Numerous other courts are in accord.[2]

Here, like the objecting party in *In re Seminole Walls*, Yucaipa (and also the Committee) effectively sought to rescind the settlement agreement before the Bankruptcy Court could approve it.  For example, in its objection to the Request for Hearing, Yucaipa based its opposition on a faulty theory of mutual mistake, Ex. G ¶¶ 4-7, as well as a general appeal to "changed circumstances" that Yucaipa contended denied it the "benefit of its bargain," *id.* ¶ 8.  Likewise, the Committee objected to entry of the settlement agreement based on what it viewed as "changed circumstances" that developed after the Committee signed the agreement.  Ex. H ¶ 19.  These arguments are simply meritless, post-hoc efforts to second guess and back out of the deal the parties struck; they are simply not enough to undo a validly executed contract.  *See, e.g.*, *In re Lyons Transp. Lines, Inc.*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994) (holding party could not withdraw from settlement motion due to changed circumstances, including intervening enactment of a new statute); *In re United Shipping Co.*, No. 4-88-533, 1989 WL 12723, at *8

---

[2]      *See, e.g.*, *In re Turner*, 274 B.R. 675, 679–81 (Bankr. W.D. Pa. 2002) (holding parties bound to settlement agreement pending court approval and stating, "[a]pplying principles of contract law, it is clear that the parties before us reached a binding agreement.  The only condition subsequent was that the Trustee seek and obtain court approval which the Trustee has promptly sought."); *In re Frye*, 216 B.R. 166, 173–74 (Bankr. E.D. Va. 1997) ("It would be inequitable to allow a party to an otherwise enforceable agreement . . . to revoke an offer after it had been accepted merely because the court had not yet heard the motion to approve the compromise of the claim.  The agreement is therefore binding on the parties pending approval by this Court."); *In re Tidewater Group, Inc.*, 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981) ("The Court feels that an agreement by a debtor in possession to compromise litigation should also be binding upon all parties to the agreement pending a Court determination as to whether or not to approve the agreement.").

(Bankr. D. Minn. Feb. 17, 1989) ("This court will not rescind a settlement agreement merely because one party knows it made a bad bargain."). Accordingly, consistent with applicable law, the Bankruptcy Court should have disregarded Yucaipa's (and the Committee's) attempts to back out of the agreement.

Instead, the Bankruptcy Court erroneously held that "Yucaipa has negotiated an out, if you will, of the [settlement] agreement, and they've made it clear they intend to exercise that out." Ex. K at 37. Contrary to Yucaipa's argument—asserted for the first time at the hearing, and upon which Judge Sontchi based this ruling—the settlement agreement does not provide Yucaipa a free "out" by which they can simply elect, in their complete discretion, not to comply with the settlement agreement. As described above, the settlement agreement not only requires Yucaipa to contribute cash and other assets to the settlement, but it also specifically requires Yucaipa to use its "best efforts" to support the agreement and to seek court approval of the settlement agreement. *See* Ex. C §§ VIII(A)-(B), IX(B), IX(L). The Bankruptcy Court simply ignored these binding contractual provisions, instead resting its ruling on Section VIII(N) of the settlement agreement, which provides that, if Yucaipa fails to pay its share of the settlement sum, then "this Agreement and each of its terms, conditions, and provisions . . . shall be null and void and of no force and effect . . . ." *Id.* § VIII(N); *see also id.* § I(C) (providing that if Yucaipa fails to pay, "this Agreement, as to Yucaipa and the Yucaipa-Affiliated Allied Directors, shall be deemed void in its entirety"). But, at most, that section simply defines what happens if Yucaipa *breaches* the agreement by failing to pay; that section does not give Yucaipa *permission* to breach. Indeed, the settlement agreement's "enforcement" provision—which gives each party the ability to enforce the other's obligations under the agreement, *see id.* § IX(L), would be

14

rendered meaningless if Yucaipa could simply choose not to comply with its fundamental payment obligations under the agreement.

Finally, that one party may or may not breach a settlement is not reason to deny its approval at the outset.  At a minimum, the Bankruptcy Court should have held a hearing, by which it could have (a) permitted briefing on the issue of whether Yucaipa had an "out" under the agreement, (b) heard evidence and made findings based on the traditional factors governing the Rule 9019 analysis for approval of settlement agreements (*see infra* Section IV), and (c) taken evidence concerning whether Yucaipa would, in fact, refuse to comply with its payment obligations under the agreement, and the ramifications of such refusal.  Indeed, no Yucaipa fact witness ever testified that Yucaipa would do so; the only thing before the Bankruptcy Court was a statement by one of Yucaipa's counsel that Yucaipa did not "intend" to abide by its payment obligations under the agreement.  At a hearing, the Bankruptcy Court could sort through these issues, including by considering in full the consequences of Yucaipa's refusal to pay under the agreement.  The Bankruptcy Court erred by denying the Settlement Motion without at least undertaking such a hearing.

## III.   The Bankruptcy Court Erred by Concluding that the Settlement Agreement Was Required to Fix the Amount of Yucaipa's Allowed Claim for All Parties

The Bankruptcy Court also erred by denying the Settlement Motion for yet another reason not briefed (or even asserted) by the parties.  In particular, the Bankruptcy Court concluded—after raising this issue for the first time at the hearing—that the agreement was "fundamentally flawed" because it did not resolve Black Diamond and Spectrum's dispute with Yucaipa concerning the amount of Yucaipa's allowed claim. Ex. K at 38.  The court appeared concerned that, "because the allowed amount of the claim doesn't affect all parties who might object to the claim," such as Black Diamond and Spectrum, then "there really isn't consideration

15

flowing to the estate." *Id*. at 11.   The Bankruptcy Court concluded that "without fixing the amount of the [Yucaipa] claim applicable to all parties the claim isn't fixed.   So it doesn't accomplish what it was intended to accomplish." *Id*. at 38.   In doing so, the Bankruptcy Court erred:   the settlement agreement did not purport to, nor was it required to, resolve all potential disputes about the amount of Yucaipa's claim against the bankruptcy estate.

One of the key "global" disputes between Yucaipa on the one hand, and the Committee and Black Diamond / Spectrum on the other, is how much first lien debt Yucaipa holds or should hold.   Yucaipa contends that it holds $169.8 million in first lien debt, which it purchased after the passage of the Fourth Amendment to Allied's first lien credit agreement.   The Fourth Amendment is one of the key disputes between the parties in the underlying litigation.   Indeed, the Committee and Black Diamond / Spectrum contend that the Fourth Amendment is invalid, and thus Yucaipa's purchase of debt made possible by that amendment is likewise invalid. Accordingly, the Committee and Black Diamond / Spectrum assert that Yucaipa holds far *less* in first lien debt than $169.8 million, and that the amount of Yucaipa's claim against Debtors' estates must therefore be far less than $169.8 million.

The settlement agreement resolves this dispute only as between Yucaipa and the Committee (standing in the shoes of the Debtors), but not as between Yucaipa and Black Diamond / Spectrum.   By agreeing to waive certain amounts of its first (and second) lien debt, Yucaipa agreed to assert a *smaller* claim against Debtors' estates (*i.e.*, for $113.8 million, instead of $169.8 million).   *See* Ex. C §§ III(A), (B).   This effectively sets a ceiling on Yucaipa's claim, which in turn provides an immediate benefit—and thus consideration—to the Debtors' estates. Yucaipa's waiver of some first lien debt means there may be more to distribute to Allied's other creditors, including Black Diamond and Spectrum, as well as the general unsecured creditors

represented by the Committee.   Thus, in exchange for these (and other) contributions by Yucaipa, the Committee agreed not to object to Yucaipa's claim.  *Id*. § III(B).  This is not the same as the Bankruptcy Court deeming the claim allowed and ordering Yucaipa entitled to it.

In fact, the settlement agreement *preserves* any other party's right to object to Yucaipa's claim.  *See id*. (setting the amount of Yucaipa's claim "subject to the rights of any party in interest . . . to object pursuant to section 502 of the Bankruptcy Code").   Thus, even after the settlement agreement, Black Diamond / Spectrum can object to Yucaipa's claim ($113.8 million), and argue that Yucaipa is not even entitled to that lesser amount.   The Bankruptcy Court did not acknowledge or address this provision of the agreement at the hearing.

The Bankruptcy Court erred by effectively requiring that the settlement agreement resolve *all* disputes between Yucaipa and Black Diamond / Spectrum as to the amount of Yucaipa's claim.   Contrary to the Bankruptcy Court's suggestion, the settlement agreement was not "intended to accomplish" the fixing of the amount of Yucaipa's claim as "to all parties."  Ex. K at 38.  Rather, it was intended to settle the estate claims for valuable consideration, including the contribution of cash, second lien debt, and a significant reduction in the amount of Yucaipa's first lien claims.   These contributions grow the pot and reduce the amount of demands on that pot, thereby substantially benefiting the Debtors' estates and all other creditors.   That Black Diamond / Spectrum may later object to the amount of Yucaipa's now-lessened claim, and may prevail in reducing that claim even further, is irrelevant.  Such an outcome would only provide a potentially greater recovery to Allied's other creditors.[3]

---

[3]    At a minimum, the Bankruptcy Court should have deferred consideration of this issue—and all of its legal, factual, and procedural implications—until the time of a full evidentiary hearing, which would have given the parties an opportunity to fully brief and vet the issues.

IV.     **The Bankruptcy Court Erred by Refusing to Conduct an Evidentiary Hearing on Whether the Settlement Agreement Is in the Best Interests of Debtors' Estates**

The Bankruptcy Court also erred by refusing to conduct an evidentiary hearing on whether the settlement agreement is—as a matter of fact—in the best interests of the Debtors' estates.  Indeed, all of the parties to the settlement agreement, including Yucaipa and the Committee, represented to the Bankruptcy Court in the Settlement Motion that the agreement *was* in the best interests of and manifestly beneficial to the Debtors' estates.  *See supra* p. 6; Ex. B ¶ 54.  At a minimum, the parties' eventual change of heart that led them to oppose approval of the agreement necessitated an evidentiary hearing in which the Bankruptcy Court could sort these issues out as a factual matter, as the law requires.

Here, the parties to the Settlement Motion agreed and affirmatively asserted that the *Martin* factors were met, identifying numerous reasons why the agreement is in the best interests of the Debtors' estates. Ex. B ¶¶ 4, 36-58.  Some of those same parties later expressed a change of heart and asserted objections to the settlement agreement, which should have prompted the Bankruptcy Court to schedule a hearing in which the proponents of the settlement (namely, Appellants and their insurance carriers who would be funding the settlement) would have had an opportunity to rebut and cross examine those and any other objections as a factual matter.  That did not happen.  Instead, the Bankruptcy Court sustained the objections, notwithstanding substantial evidence in favor of approving the settlement that the parties had presented through the Settlement Motion.  In the end, the Bankruptcy Court did not make any findings of fact on the *Martin* factors, which is reversible error.  *See RFE Indus.*, 283 F.3 at 165 (reversing denial of settlement motion where court "did not make any findings of fact on these four [*Martin*] issues").

Had Mr. Gendregske had the opportunity, he would have presented evidence to demonstrate the settlement was fair, reasonable, and in the best interests of the Debtors' estates,

including specifically that (1) the claims against Mr. Gendregske (and any potential claims against Mr. Cullen) are weak and unsubstantiated, indicating a low probability of a successful judgment; (2) in the event any insurance policies are exhausted or deemed inapplicable, then there would be serious difficulties in collection against Mr. Gendregske, a non-Yucaipa affiliated individual; (3) the litigation is highly complex (due in large part to legal and factual issues that pertain to Mr. Gendregske only) and highly costly (a substantial amount of insurance funds already have been expended on Mr. Gendregske's legal fees, and even more would be exhausted before any final judgment); and (4) the creditors would benefit substantially by obtaining an influx of cash into the Debtors' estates that would eventually be distributed.  At a minimum, Mr. Gendregske and Mr. Cullen were entitled to a full, robust evidentiary hearing on the foregoing issues, but none was provided.

An evidentiary hearing would have provided a vehicle through which Appellants could make a *factual* case in opposition to the various arguments asserted by the other parties against approval of the settlement agreement.  For example, although the Bankruptcy Court indicated that its ruling was not based on Yucaipa's argument that the settlement agreement must fail for mutual mistake—an argument even the Committee disagreed with—this too is an issue that could have been addressed in the course of an evidentiary hearing.  To establish the existence of a mutual mistake, Yucaipa would be required to satisfy a "heavy burden" to show by "clear and convincing proof" that *both* parties (Yucaipa and the Committee) entertained the same mistake at the time of the settlement agreement's execution.  *See Carney v. Carozza*, 792 N.Y.S.2d 642, 644 (N.Y. App. Div. 2005).[4]  In this case, however, the Committee—the other supposedly mistaken party—"disagrees" with Yucaipa's argument and takes the position that the settlement

---

[4]     The settlement agreement contains a New York choice of law provision.  Ex. C § IX(O).

agreement "is clear and unambiguous." Ex. H ¶ 4; *accord id.* ¶ 14.  As such, this dispute is about interpretation—not validity—of the contract.  *See Forbo-Giubiasco S.A. v. Congoleum Corp.*, 482 F. Supp. 716, 719 (S.D.N.Y. 1980) (finding no mutual mistake where the parties "entertained different notions as to how [the contract] was to be interpreted").[5]  At bottom, issues surrounding whether there was a "mutual mistake" are fact-bound and necessitated a hearing.

In sum, the Bankruptcy Court is well equipped—and, indeed, obligated—to resolve all of the issues implicated in the settlement agreement in the course of a full evidentiary hearing, at which time the proponents of the Settlement Motion can put forth evidence supporting the Settlement Motion, and the Court can make factual findings for each of the *Martin* factors. Because none of these important procedural steps were taken here, the Bankruptcy Court erred.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court enter an order (a) reversing the Bankruptcy Court's order denying Appellants' Request for Hearing and rejecting the settlement agreement, and (b) approving the Settlement Motion.  Alternatively, the Court should vacate the Bankruptcy Court's order and remand for a hearing in the Bankruptcy Court in which Appellants can present evidence that the settlement agreement is in the best interests of the Debtors' estates and the Bankruptcy Court can make findings in accordance with the applicable standards set forth in *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

---

[5]     In fact, it appears that, if there was any mistake at all, it was a unilateral mistake on Yucaipa's part for apparently neglecting to account for its accrued interest claims under the First Lien agreement.  *See* Restatement (Second) of Contracts § 153, cmt. c, illus. 1-4 (1981).  Even then, however, Yucaipa had not demonstrated as a factual matter that enforcement of the Settlement Agreement as written would be unconscionable, or that Yucaipa made the mistake despite the exercise of ordinary care.  *See Long v. Fitzgerald*, 659 N.Y.S.2d 544, 547 (N.Y. App. Div. 1997).

Dated:  July 9, 2015

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

/s/ Derek C. Abbott
Derek C. Abbott (No. 3376)
Erin R. Fay (No. 5268)
1201 North Market Street
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989
dabbott@mnat.com
efay@mnat.com

-- and --

ARNOLD & PORTER LLP
John C. Massaro  (*pro hac vice* request forthcoming)
Ian S. Hoffman  (*pro hac vice* request forthcoming)
555 Twelfth Street, NW
Washington, D.C.  20004-1206
T: 202-942-5000
F: 202-942-5999
john.massaro@aporter.com
ian.hoffman@aporter.com

*Counsel for Mark Gendregske
and Brian Cullen*

21